UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RUSTY RODRIGUEZ, : | |
| : | |
| Plaintiff : | CIV NO. 3:03-cv-1597 (WWE) |
| : | |
| v. : | |
| : | |
| CITY OF BRIDGEPORT, : | |
| CITY OF BRIDGEPORT POLICE : | |
| DEPARTMENT, THOMAS LULA, : | |
| VINCENT INGRASSIA, LOUIS : | |
| CORTELLO, and JOHN TENN, : | |
| : | |
| Defendants. : | December 2, 2005 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Rusty Rodriguez, has brought this action pursuant to 42 U.S.C. sections 1983 and 1988 and article 1, section 8 of the Connecticut Constitution, alleging violations of his federal and state constitutional rights and his rights under state common law.  Specifically, Rodriguez claims that the defendants, the City of Bridgeport, the City of Bridgeport Police Department, Thomas Lula, Vincent Ingrassia, Louis Cortello and John Tenn (collectively, "the defendants"), violated his rights in that they searched his home, automobile and place of business with false warrants, arrested him without probable cause, maliciously prosecuted him, falsely imprisoned him, and subjected him to the negligent infliction of emotional distress and the intentional infliction of emotional distress.  The defendants argue that the plaintiff fails to state a claim against any defendant upon which relief may be granted, that there was probable cause for the search and arrest warrants and that, since the defendants' conduct was objectively reasonable,

1

they are entitled to qualified immunity. The Court will grant the defendants' motion for summary judgment [Doc. # 27].

## I. BACKGROUND

On June 16, 1999, Damian ("Copi") Santos was found dead with multiple gunshots to his body and two gunshots to his head. Defendants Lula, Ingrassia, Cortello and Tenn, all detectives in the City of Bridgeport Police Department,[1] responded to the scene and initiated an investigation that proceeded until June 26, 2000, when the plaintiff was arrested and charged with murder for the shooting death of Santos, conspiracy to commit murder and criminal liability for the acts of another.

From the outset of their investigation, the defendants believed that there were at least two shooters involved in the murder. This was supported by the facts that five .45 caliber cartridge casings were found at the scene and were determined by the ballistics expert to be shot from the same .45 caliber firearm and the bullet fragments removed from the victim's head were found to be fired from either a .38 Special or a .357 caliber revolver. The evidence of two weapons at the scene of the murder led to the conclusion that there were two shooters present. This was corroborated by some of the witnesses' statements.

Throughout the investigation, the detectives took statements from approximately a dozen witnesses, traced the victim's activities on the date of the murder, had numerous ballistics examinations conducted, analyzed cell phone calls, school records, criminal records, residential and workplace utilities bills and automobile registration. The defendants also obtained three

---

[1] Detective Lula was the supervisor in charge of and was ultimately responsible for the investigation that was conducted by Detectives Ingrassia, Cortello and Tenn.

separate search warrants related to the plaintiff and other warrants related to other suspects.

Some of the most significant evidence leading the defendants to believe that the plaintiff was one of those involved in the murder was gleaned from the warranted searches of the plaintiff's residence, his car and his place of business. At his home, the defendants discovered, *inter alia*, .45 caliber ammunition, a "slide stop," two 9 mm Llama pistols with an obliterated serial number and a Colt .44 caliber revolver. They also found an ammunition box containing three different brands of .45 caliber ammunition and various .38 caliber ammunition. At his place of business – a tire shop named "Cuba Tire" – the defendants discovered additional ballistics evidence and a "shooting range" in the basement.[2] The subsequent search of the basement led to the discovery of a .22 caliber pistol, a loaded six-shot Smith and Wesson .38 caliber revolver, several spent cartridges, one spent .45 caliber cartridge and one .45 caliber bullet.

The defendants also learned, through various interviews with different individuals, that the plaintiff was well known as a gun dealer and that he was known to have guns in his possession. He was also linked to the victim on the day of the murder. It was learned from Joaquim Melendez that on the date of the homicide, the victim and the plaintiff were talking in the tire store. An interview with Daniel Gonzalez revealed that the victim had told him that he was to meet the plaintiff at La Familia Restaurant on the night of the murder, ostensibly to sell him guns, but that he planned to "stick up the Cuban guy" instead. Gonzalez positively identified the "Cuban guy" as Rusty Rodriguez. This information was also obtained through an interview with Alejandro Melendez, a son of Joaquim. Furthermore, another witness, Michael Baloga, told

---

[2] The shooting range was created by lining the tires in rows. These rows ended at a wall that was marked by multiple gunshot holes. Plaster and portions of the wall had fallen on the tires, indicating that the guns had been fired after the tire store was operating.

3

one of the defendants that he had been told that the plaintiff had murdered Santos.

Defendant Lula, as the supervisor in charge of the investigation, prepared and submitted an affidavit dated September 2, 1999 to the Office of the State's Attorney. The affidavit was prepared pursuant to the defendants' application for a warrant to arrest the plaintiff on the charges of conspiracy to commit murder, murder, and criminal liability for the acts of another. The State's Attorney advised the defendants that the warrant was insufficient and that they had to provide more information regarding the plaintiff's involvement in the murder in order to reach the threshold of probable cause.

After the rejection of the September 2 warrant application, the defendants decided to submit the ballistics evidence to the FBI for analysis. Agent Kathleen Lundy subsequently issued two reports, one in January 2000 and another in March 2000, in which she concluded that some of the .45 caliber ballistics evidence collected from the crime scene and the .45 caliber ballistics evidence seized from the plaintiff's residence were "analytically indistinguishable from one another."

Armed with this evidence, the defendant Lula revised the warrant application and submitted an affidavit reflecting such changes. On June 15, 2000, the State's Attorney's Office and the judicial authority approved the application and issued a warrant for the arrest of Rusty Rodriguez. The plaintiff was arrested on June 26, 2000. The court (Thim, J.) then conducted a probable cause hearing, including two days of testimony regarding the plaintiff's challenge to the existence of probable cause and determined, on August 4, 2000, that there was sufficient probable cause and that the warrant had been appropriately executed. The case was subsequently tried before a judge (Ford, J.) and jury in March 2002. On March 27, 2002, after presentation of

the prosecution's case, the court granted the plaintiff's motion for acquittal as to all charges.

## II.  DISCUSSION

1. Standard of Review

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 24.

2. Search Warrant

The plaintiff claims that the defendants, collectively and individually, violated his rights

5

pursuant to 42 U.S.C. section 1983 in that there was no probable cause for the search of his home, workplace or car.  The defendants argue that there was no violation of the plaintiff's constitutional rights because they possessed the requisite probable cause for the search of the plaintiff's property.

In order to prevail on a 1983 claim for unconstitutional search, one must have a valid warrant issued by a neutral magistrate.  "The bulwark of Fourth Amendment protection is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate."  Franks v. Delaware, 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). "The role of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  A district court reviewing a magistrate judge's issuance of a warrant must accord the magistrate judge's determination substantial deference.  United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983).  The district court may not overturn the magistrate judge's determination of probable cause so long as the magistrate judge had a substantial basis for the decision. Gates, 462 U.S. at 238-9.  "The magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant." Travisano, 724 F.2d at 345.

The judicial official must establish that there exists probable cause to issue the warrant. "To establish probable cause to search a residence, two factual showings are necessary - first, that a crime was committed, and second, that there is probable cause to believe that the evidence of

6

such crime is located at the residence." Travisano, 724 F.2d at 345. "Once it is established that probable cause exists to believe a federal crime has been committed, a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime." Zurcher v. Stanford Daily, 436 U.S. 547, 558, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). It is significant to note, however, that "probable cause only requires the probability, and not a prima facie showing, of criminal activity." Gates, 462 U.S. at 235.

In the present case, the defendants argue that the searches of the plaintiff's car, place of business and home were all conducted to warrants issued by a neutral judicial official and that these warrants did contain the requisite probable cause. The defendants had obtained statements by Alejandro Melendez, Joaquin Melendez and David Gonzalez implicating the plaintiff in the murder of Santos and suggesting that evidence of the crime would be found in the plaintiff's car, place of business and residence. Defendant Lula testified in his affidavit that, based on these witnesses, he believed that the plaintiff was concealing the weapons and ammunition used in the murder in one of these locations.[3] The magistrate determined that this satisfied the probable cause requirement. The Court will affirm the decision of the magistrate.

---

[3] As part of his objection to the probable cause to search, the plaintiff argues that the warrant for the search of Cuba Tire, the plaintiff's place of business, did not include the shared basement of the building, which is where the evidence was found. In his affidavit, defendant Lula refers to "the section of J and M Auto Parts which is controlled and utilized by Cuba Tire." The Court finds that the warrant does include the basement as it is undoubtedly part of the building controlled and utilized by Cuba Tire. Consistent with the theory expounded in Zurcher, 436 U.S. at 558, the Court finds that the warrant was issued for the search of any property which the judicial official had probable cause to believe may contain contraband or other evidence of the crime. As the plaintiff "controlled and utilized" at least a section of the basement, the judicial official had probable cause to approve the search of same.

The plaintiff argues that the defendants "cherry-picked" information to be included in the search warrant application, thereby abrogating satisfaction of the probable cause standard. Specifically, the plaintiff claims, *inter alia*, that the defendants did not include information that could discredit the witnesses upon which they relied, such as the fact that Alejandro Melendez was in custody facing charges for another homicide when he made the statements to the police, or the fact that there were other suspects in the Santos murder investigation, including Melendez.

However, the defendants were under no duty to include such information in the warrants to search the plaintiff's property. Simply put, the inclusion of such information in the application to search the plaintiff's premises would be irrelevant and unnecessary for a finding of probable cause for the search. The plaintiff has not established any link between the evidence he suggests was erroneously excluded and the finding of probable cause to search the plaintiff's premises. The inclusion of such information or the omission of other information would neither add nor detract from the judicial official's finding of probable cause. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." United States v. Awadallah, 349 F.3d 42, 65 (2d Cir. 2003). In order to survive a motion for summary judgment, the plaintiff must prove that there is a "genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'" Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994). The plaintiff does not accomplish this.

3.  Arrest Warrant

The standard for an arrest warrant is the same as that for a search warrant. "It is settled that a person has a clearly established right not to be arrested or prosecuted without probable cause." Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993). Probable cause is a complete defense to a claim for false arrest. "Because probable cause constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." Bontatibus v. Ayr, 386 F.Supp.2d 28, 32 (D.Conn. 2005). "In determining whether police officers had probable cause to make an arrest, courts examine the totality of the circumstances. Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Colon v. Ludemann, 283 F.Supp.2d 747 (D.Conn. 2003).

Here, the plaintiff claims that the arrest warrant application of September 2, 1999 does not provide probable cause. This claim is irrelevant because the defendants did not base their arrest of the plaintiff on the September 2, 1999 warrant; instead, they arrested him pursuant to the affidavit and application of June 15, 2000. Indeed, the defendants reveal that when they presented the 1999 application to the prosecution, they were advised to continue the investigation in order to obtain more information.[4] The defendants then continued their investigation, including sending the ballistics evidence to the Federal Bureau of Investigation for further evidentiary analysis. According to a report by Agent Kathleen Lundy dated January 3, 2000, the FBI's testing revealed that "the specimens within each lead composition group containing more

---

[4]The 1999 warrant for the plaintiff's arrest was never executed.

9

than one specimen [i.e., the bullets from the victim as compared to the cartridges found in the ammunition box discovered in the plaintiff's residence] are analytically indistinguishable from one another. This is consistent with the specimens within those groups originating from the same source (melt) of bullet lead." Upon conducting another test on additional ballistics evidence, Agent Lundy reported the same conclusion in her March 2, 2000 report, namely, that the "specimens within each lead composition group" are "analytically indistinguishable from one another." This information linking the bullets found in the plaintiff's home with those discovered both at the scene of the murder and in the victim's body was included in the June 15, 2000 warrant application. The defendants contend that the warrant – approved by the Office of the State's Attorney and issued by a neutral and disinterested judicial official – contained probable cause sufficient to arrest the plaintiff and that the arrest, therefore, was valid. The Court agrees with the defendants.

     Once again, as with the search warrant application, the plaintiff attempts to undermine the validity of the arrest warrant by claiming that the defendants omitted certain salient information and included other "overstated" claims in the warrant application in order to persuade the judicial authority that probable cause existed. The plaintiff argues that, *inter alia*, the defendants failed to include information about the witnesses upon whose information the defendants relied (e.g., that Michael Baloga, who allegedly told the police that he had been told by another suspect in the killing that the suspect and the plaintiff had killed Santos, was also a suspect in the case and had admitted to holding one of the weapons at one time) and had also included information that was questionable (e.g., that the results of the FBI tests were embellished in order to sound more persuasive). The Court finds this argument lacking and agrees with the defendants that the

warrant for the plaintiff's arrest contained probable cause.

A plaintiff challenging the validity of an arrest warrant faces a heavy burden. <u>Simms v. Village of Albion, N.Y.</u>, 115 F.3d 1098, 1107 (2d Cir. 1997). Because he was arrested pursuant to a facially valid arrest warrant, plaintiff must rebut the presumption of probable cause created by the issuance of the arrest warrant. <u>Bontatibus</u>, 386 F.Supp.2d at 33. In order to mount such a challenge, "the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." <u>Velardi</u>, 40 F.3d at 573. The reviewing court must add the excluded information and extract the allegedly erroneously included information and then determine if the "corrected affidavit" would support a finding of probable cause. <u>Soares</u>, 8 F.3d at 920.

In the present instance, the plaintiff claimed before the state court, as he claims here, that the omitted information (that the police were investigating other suspects and the possible unreliability of one of the alleged witnesses) and the inclusion of allegedly false information (that the evidence presented through the FBI reports by Agent Lundy was "grossly over-stated") denude the warrant of its requisite probable cause. As a result of this challenge, the state court conducted a two-day probable cause hearing on August 3 and 4, 2000, before Judge Thim. Judge Thim found that probable cause did exist and that the warrants were valid. Thus, the plaintiff must now overcome two decisions by judicial officials: the original approval of the warrant application and the conclusion of the state court hearing that such approval was appropriate. The Court finds that the plaintiff satisfies neither of these challenges.

Applying the test outlined above, the Court finds that Judge Thim was correct in his

assessment of the warrants' validity.   The plaintiff has not met the heavy burden of presenting a false statement included in or a material omission from the affidavit that was material to the establishment of probable cause. As with the search warrant, the information that the plaintiff is claiming invalidates the arrest warrant is irrelevant to the judicial official's finding of probable cause. The "corrected" affidavit, therefore, also possesses probable cause. This affirms the approval of the original application. Judge Thim determined that, without more, the arrest warrant was sufficient to stand on its own.

The arrest of the plaintiff was not necessarily conditioned on the fact that he was, without any doubt, Santos' killer.  The warrant was designed to provide the police officers with further ability to determine whether this was true.  The warrant is a tool by which the police officer may arrest an individual who has been linked significantly to the commission of a crime.  An arrest warrant is not a vehicle by which to convict such an individual. "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must constitute more than rumor, suspicion, or even a strong reason to suspect."  United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983).  Accordingly,

> the police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it, but they may not withhold evidence where discrepancies are so substantive that failure to disclose them would be comparable to fraud or perjury.  It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior to be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity.

Williams v. New York, 2003 WL 22434151, *4 (S.D.N.Y.).  The fact that the plaintiff was ultimately acquitted of the crime does not obviate the validity of the warrant.

12

Furthermore, the police officers are obligated to fulfill the purpose of a facially valid warrant that has been approved by a judicial officer. "The arresting officer need not inquire into the merits of a facially valid arrest warrant before execution. Indeed, once probable cause has been established by a judicial officer and an arrest warrant has been issued, the warrant compels arrest and a law enforcement officer ignores this command at his peril." Dirienzo v. United States, 690 F.Supp. 1149, 1154 n 4 (D.Conn. 1988). See also Benjamin v. United States, 554 F.Supp. 82, 86 (E.D.N.Y. 1982) ("Under the Federal Rules of Criminal Procedure, once probable cause has been established by a judicial officer, and an arrest warrant issued, the warrant *shall* be executed by the arrest of the defendant."). Thus, the police officers were fulfilling their duty in their arrest of the plaintiff, properly relying on the judicial officer's finding of probable cause.

4. Qualified Immunity

Even if the Court were to find that the warrants for the search of the plaintiff's premises and for his arrest were lacking in probable cause, the police officers are protected from both liability and suit by the doctrine of qualified immunity.

> Although the right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right, a police officer is entitled to qualified immunity shielding him or her from a claim of damages for false arrest where (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent officers could disagree as to whether there was probable cause to arrest. Thus, the defense of qualified immunity – once called 'good faith immunity' – now turns on the objective reasonableness of an officer's actions.

Colon, 283 F.Supp.2d at 760. "The inquiry into whether a suit against officers should go forward is a two-step process: (1) the court must determine whether the facts, taken in the light most

favorable to the party asserting an injury, show a violation of a constitutional right; and (2) the court must determine whether the constitutional right was clearly established such that the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005).

The Court has already determined that there were no constitutional violations inherent to the warrants for search or arrest.  Therefore, we need go no further than the first step of inquiry. Examining the facts in the light most favorable to the plaintiff, he asserts nothing that is of material significance as to the validity of the warrants.  "When police officers move for summary judgment on the basis of qualified immunity, plaintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging even meritorious factual disputes relating to probable cause, when those controversies are nevertheless not material to the ultimate resolution of the immunity issue." Velardi, 40 F.3d at 573.

Since the Court has determined that the judicial officer properly found the warrant applications possessed probable cause,  the defendants' reliance on the authorization of the warrants was objectively reasonable.  "When analyzing issues surrounding the constitutionality of searches and seizures under the Fourth Amendment, we have adopted a wholly objective 'authorization' test, which states that 'so long as the police are doing no more than they are legally permitted and objectively authorized to do, their actions are constitutional." Simms, 115 F.3d at 1108.

Even if there had been a constitutional violation, the defendants are still entitled to qualified immunity insofar as it was reasonable for them to believe that their actions did not

violate such rights.

> A police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity from personal liability for damages. Police activity conducted pursuant to a warrant rarely will require any deep inquiry into reasonableness because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith. However, the officer's reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable. The court's inquiry into reasonableness is limited to determining whether a reasonably well trained officer would have known that the warrants were illegal despite the magistrate's authorization.

Simms, 115 F.3d at 1106.

Here, the defendants had every reason to believe that the warrants were legal. Not only were they facially valid and approved by a "neutral and objective" judicial official, but the applications objectively contained enough evidence to support a finding of probable cause: the plaintiff was substantially linked to the commission of a crime. The fact that the plaintiff alleges that there was no probable cause because of the omission and inclusion of information does not undermine the defendants' contention that the judicial official's finding was correct. The plaintiff does not point to any germane omission or inclusion that could have altered the finding of probable cause. There was no reason for the arresting officers to believe that the warrants were illegal. Accordingly, the Court will find that the defendants are protected by the doctrine of qualified immunity.

Because the Court finds that there is no constitutional violation and, alternatively, that the officers are protected by qualified immunity, the analysis of the plaintiff's argument need go no further and the Court declines to review the additional claims.

## III.  CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [Doc. # 27].

The Clerk is instructed to close this case.


SO ORDERED this _6th____ day of December, 2005 at Bridgeport, Connecticut.


                                                  _____/s/_____
                                                  Warren W. Eginton
                                                  Senior United States District Judge